IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LADELL EVANS and
BRANDON HARRISON,

          Plaintiffs,                      OPINION AND ORDER

   v.

                                              18-cv-194-wmc

CO SHAWN GALLINGER,

          Defendant.

On December 11, 2017, *pro se* plaintiffs LaDell Evans and Brandon Harrison were housed in cells close to one another in the Echo Unit of the Wisconsin Secure Program Facility ("WSPF") and allegedly subjected to sewer gas fumes that caused them difficulty breathing. Afterwards, they filed this lawsuit, and the court granted both plaintiffs leave to proceed against WSPF Correctional Officer Shawn Gallinger on their claim that Gallinger acted with deliberate indifference to reports that they could not breathe, in violation of the Eighth Amendment. (Dkt. #25.) Before the court are plaintiff Evans' motion for assistance in recruiting counsel (dkt. #60), and defendant Gallinger's motion for summary judgment (dkt. #62).

With respect to Evans' motion, he seeks recruitment of counsel because he has mental health issues and was in quarantine with limited access to legal resources at the time defendant filed his motion for summary judgment. However, Evans responded in writing to defendant's motion for summary judgment with contrary facts and legal argument, including his own declaration. (Dkt. ##79, 80, 81.) His submissions demonstrate both an understanding of the material facts and legal standards. As such, the

court will deny Evans' motion.

With respect to defendant's motion for summary judgment, the court concludes from the reasons explained in its opinion below that no reasonable jury could find that Gallinger consciously disregarded a substantial risk of harm to either plaintiff, even when construing the evidence of record in plaintiffs' favor. Accordingly, the court will grant defendant's motion for summary judgment on plaintiffs' Eighth Amendment claims.[1]

UNDISPUTED FACTS[2]

A. Parties

As noted, plaintiffs' claim arises from events that occurred during a security inspection and shakedown that took place on December 11, 2017, at WSPF, where Correctional Officer Gallinger was working and continues to work. Although Evans remains incarcerated at WSPF, Harrison is now incarcerated at the Waupun Correctional Institution in Waupun, Wisconsin.

---

[1] Previously in this lawsuit, plaintiff Evans also filed a motion seeking sanctions against defendant Gallinger for failing to preserve video footage of the events related to his claim. The court denied that motion but directed defendants to provide a more detailed account of the Wisconsin Department of Corrections' video footage retention policies. Defendants responded accordingly and the court has reviewed that information. Although not relevant to the defendant's present motion for summary judgment, nor to this case more generally (since there is *no* evidence that Gallinger had a hand in failing to preserve the footage), the court appreciates the detailed report from defense counsel and will consider it in future matters involving the DOC's retention policies and practices.

[2] Unless otherwise noted, the following facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

**B. WSPF Security Inspection and Shakedown Procedures**

Under Restricted DAI Policy 306.15.01, WSPF's warden or designee has the authority to order staff to conduct security inspections and "shakedowns" to ensure a safe, secure, and contraband-free facility. In particular, a shakedown is defined as a thorough, systematic and organized method of searching the entire or partial area of the institution as authorized by WSPF's warden or his designee. During a shakedown, prisoners are moved out of their cells and placed in a different location.

WSPF's Buildings and Grounds Superintendent Stanley Potratz is generally responsible for ensuring that searches and inspections of all areas of the facility are carried out in compliance with procedures. Shakedowns of inmates' cells include an inspection of sink and shower drains, toilets and plumbing stacks for contraband, all of which are opened and inspected by a strike team of four maintenance personnel. One member of this so-called strike team on December 11, 2017, was Randy Kuykendall, a plumber who works at WSPF and details inspections carried out with the help of three other staff members.

In each cell, the strike team removes the tamper proof screws on the drain cover, lifts the drain cover, then vacuums the water out of the drain trap. The team also opens the shop vacuum to inspect the contents removed from the drain for contraband and inspects the drain with a flashlight. The strike team then replaces the drain cover and secures it, dries the wet floor, and puts fresh water into the shower drain to prevent sewer gas from coming back into the cell. The strike team also inspects 4-inch sanitary pipes located behind the cells, as well as vacuums and inspects the supply and return air vents

for contraband. Any contraband is photographed, and the contents of the pipe and vents are recorded.

Because these inspections involve opening the search area's sewer pipes, security staff turn the cell exhaust system on "Purge Mode," the highest setting, and turn all hallway fans on full supply to pull as much fresh air as possible through the cells and out the exhaust vent. Upon completion of the shakedown, the exhaust system and fans are returned to their normal operating settings.

### C. December 11, 2017, Security Inspection and Shakedown

On December 11, plaintiffs Evans and Harrison were housed in WSPF's Echo Unit cells 206 and 207, respectively. At 6:00 a.m., non-defendants, Sergeant Furrer and Correctional Officers Bromeland and Underwood, were on duty in the Echo Unit. Defendant Gallinger joined the Echo unit as a correctional officer as part of the first shift (from 8:00 a.m. to 4:00 p.m.).

At 8:15 a.m., WSPF conducted a planned shakedown of Echo Unit. At that time, Superintendent Potratz attests that the cell exhaust fans were turned to Purge Mode and the hallway fans were turned on full supply mode, all to ensure inmate and staff safety. Although Evans attests that his exhaust fan was off, he does not explain how he was able to determine that his vent was not functioning. (Evans Decl. (dkt. #80) ¶ 3.) Still, the court will infer that he could feel no air coming from his cell vent.

Kuykendall, as the plumber, along with three other staff members, then performed the shower and sink drain extractions of the Echo Unit cells, which included Evans' and

Harrison's cells. According to defendant Gallinger, prisoners do complain about the smell during a shakedown, which he describes as an unpleasant but harmless result of draining and clearing the cells. Superintendent Kuykendall adds that staff conducting the searches do not wear masks or use any breathing devices; the only protective equipment they use is nitrile gloves, which plaintiffs do not dispute. Nevertheless, at some point during this December 11, 2017, shakedown -- it is unclear when -- Evans complained about fumes, and staff moved him from his cell to the day room during the search. Evans attests that while he was in the day room, his breathing returned to normal, but staff brought him back to his cell before the search was complete, and his cell "filled with fumes" and he was "gasping for air." (Evans Decl. (dkt. #80) ¶ 11.) Evans further claims that he "screamed for help but the staff closed my window and told me to stop screaming." (*Id.* ¶ 12.)

At 10:55 a.m., staff passed out meals on the Echo Unit. No breathing problems by prisoners or staff were noted. At 11:14 a.m., staff passed out medications on Echo Unit, and again no breathing problems were noted. The same is true of the 11:15 a.m. count. Although Evans claims he complained to staff, he does not dispute that his breathing problems were not noted, nor does he identify the staff to whom he complained, or whether he screamed that he was having trouble breathing after being returned to his cell. (*Id.* ¶¶ 7-12.)

At 11:42 a.m., Sergeant Furrer noted that Evans stated through his intercom, "I'm going to kill myself." (Carson Decl., Ex. 505 (dkt. #68-1) 2; Ray Decl., Ex. 503 (dkt. #67-1) 1.) At 11:48 a.m., Psychological Service Unit staff member Lemieux arrived on the Echo Unit and spoke with Evans at his cell front. Evans told Lemieux that he could not breathe,

5

and he was trying to avoid harming himself. Lemieux noted that Evans was wearing a scarf around his neck, said his inhaler did not help, was upset that his television had been taken away, and felt he may hurt someone. (Ray Decl., Ex. 507 (dkt. #69-1) 4.) Lemieux further noted that when she told Evans he would be placed in observation status to reduce the risk of self-harm, Evans responded "What's that going to do? You're going to have to strap me down because my way of hurting myself is crackin' my head open," and "Come in and get me!" (*Id.*)

Evans disputes Lemieux's description about their encounter. He specifically denies complaining about his television and saying, "Come in and get me." Instead, Evans declares that he yelled, "I cannot breathe" a few times, and then said, "help me." In fairness, Lemieux *also* noted the Evans was agitated and yelling, showing behavioral instability, and throwing things in his room, which Evans does not dispute. Nor does Evans dispute that Lemieux further decided to place him on observation status where staff could monitor him to reduce the risk of self-harm.

At noon on December 11, 2017, Evans was moved out of his cell in the Echo Unit. At about 12:30 p.m., Lemieux met with Evans at a holding cell, and Evans told her that he could not handle the "sewage toxins" on Echo Unit. The two had a discussion, and because Evans had calmed down, Lemieux decided not to place him in observation status. Evans was returned to cell 206 at 1:15 p.m. In total, Evans alleges that he was had to sit in a cell filled with sewer gas for about 30 minutes.

At 1:00 p.m., the Echo Unit shakedown was completed, and the exhaust fans and hallway fans were returned to their normal operating settings. The Echo Unit logbook and

6

shift report for December 11, 2017, contain no reports of any prisoner being taken to the Health Services Unit ("HSU") for difficulty breathing. WSPF's computerized building automation system also shows that the temperature on December 11, 2017, was a steady 71 degrees. There were also no abnormal trends in the computer log or any reported heating or air exchange issues that day. Plumber Kuykendall does not recall any problems or issues with the function of the fans operating in purge mode, nor were there any lingering fumes while Kuykendall performed his job duties inside the Echo Unit cells that day.

Defendant Gallinger does not recall any specific interactions with plaintiffs Evans or Harrison at any point during his shift that day, other than later reading about Evans' threat of self-harm in the unit logbook. Gallinger further attests that if he observed Evans or Harrison having difficulty breathing, he would have used his training to respond to such symptoms, which would have required him to notify the correctional sergeant or unit supervisor, who would then notify HSU. For his part, Evans asserts in his response to defendant's motion for summary judgment that video footage of his hallway would show Gallinger at his cell door speaking to him. (*See* dkt. #79 at 4.) Even so, Evans does not state in his own declaration that Gallinger was near his cell; rather, as previously noted, Evans declares only that he "screamed for help but staff closed my window and told me to stop screaming." (Evans Decl. (dkt. #80) ¶ 12.)[3] Evans cites no other evidence suggesting

---

[3] Evans also cites a declaration he filed along with plaintiffs' complaint, but that declaration does not have an affiant. Instead, the declaration reads: "I, name below, declare that on December 11, 2017, I was a prisoner/guard, at the WI Secure Program Facility. On this day I heard Inmate Evans screaming for help and that he could not breathe during the institution shakedown." (Dkt. #3.) Besides lacking clarity as to who was making the sworn statement, the declarant does not mention Gallinger. As such, this so-called "declaration" does not create a genuine dispute about whether Gallinger knew of Evans complaints that he could not breathe.

that defendant Gallinger was ever near his cell, talked to him, or had reason to believe he was having trouble breathing.[4]

### D. Harrison's and Evans' Medical Records

Plaintiff Harrison's medical record shows that he received medical treatment in August 2017 and February 2018, but not December 11, 2017. Harrison did ask for his inhaler on December 11, 2017, which officer McDaniel delivered. However, Harrison did not seek out or require any medical treatment or appointments relating to fumes or breathing difficulties on or around December 11, 2017.

Plaintiff Evans had medical appointments on November 20 and December 27, 2017. Although he did not seek out or receive any medical attention on December 11, Evans does declare that on December 27, he received a new inhaler called Alvesco, which he claims was due to the fumes he inhaled on December 11.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and the non-moving party fails to provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*,

---

[4] Defendant Harrison did not respond to defendant's motion for summary judgment, but plaintiffs alleged in their complaint that Harrison asked Gallinger whether he was smelling sewer gas, and Gallinger confirmed that he was smelling gas. (Compl. (dkt. #1) ¶ 14.)

573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). While disputed facts are viewed in a light most favorable to the plaintiffs as the non-moving parties, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

The Eighth Amendment requires prison officials to "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To succeed on a claim challenging either his conditions of confinement or medical care, a prisoner must satisfy both objective and subjective elements. The first component in a claim challenging the constitutionality of a prisoner's conditions of confinement requires objective proof that the prisoner has been subjected to conditions so adverse that they deprive him "of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer*, 511 U.S. at 834). This objective element in a medical-care challenge requires objective proof that the prisoner has a medical need "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (citations omitted).

Under either a conditions-of-confinement or medical-care challenge, the second component of an Eighth Amendment deliberate indifference claim is the same: to be liable, a prison "official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," but then

9

failed to take appropriate steps to protect the plaintiff. *Farmer*, 511 U.S. at 837; *see also Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (a prison official has a sufficiently culpable state of mind when the official "knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk") (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)). Inadvertent error, negligence, gross negligence or even ordinary malpractice are insufficient to prove deliberate indifference. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). The court will address each plaintiff's Eighth Amendment claim with these evidentiary requirements in mind.

### I. Plaintiff Harrison

Despite the court's earlier warning to Harrison that Evans is not his attorney, and that Harrison is responsible for filing motions on his own behalf, or at a minimum indicate his intent to join a submission filed by his co-plaintiff (4/27/20 Order (dkt. #59), 1 n.1), Harrison has not responded in any way to Gallinger's motion for summary judgment. Because nothing before the court suggests that Harrison did not understand his obligation to oppose Gallinger's motion, nor he was unaware of his deadline to respond, defendant asks that the court summarily grant his motion against Harrison.

The fact that Harrison did not respond to Gallinger's motion for summary judgment does not necessarily entitle Gallinger to judgment in his favor, but it does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn." *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). In particular, by failing to respond to Gallinger's motion, Harrison concedes Gallinger's version of the facts related to his claim. *Brasic v. Heinemanns Inc.*, 121 F.3d 281, 286 (7th Cir. 1997). Even factoring in Evans'

10

version of the events on December 11, 2017, however, the evidence of record demands summary judgment in Gallinger's favor given his lack of personal involvement.

Specifically, for a prison official to be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016)). More specifically, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)). Harrison has neither submitted evidence suggesting, nor does the record as a whole suggest, that Gallinger knew about and consciously disregarded a risk of serious harm to Harrison. Even Evan's evidence about his own experience on December 11 in no way supports Harrison's claim against Gallinger. In particular, even Evans does not dispute Gallinger's averment that he did not recall having any *interactions* with Harrison on December 11. At most, plaintiffs' complaint alleges that Harrison asked Gallinger whether he was smelling sewer gas, but even that does not suggest that Harrison informed Gallinger that he was having trouble breathing, much less that Gallinger failed to take reasonable measures after learning that Harrison was having trouble breathing. Regardless, no evidence of record suggests that Gallinger had *any* involvement in responding to any complaint Harrison may have lodged about sewer gas in his cell on December 11, and he is entitled to judgment in his favor as to Harrison's claim.

## II. Plaintiff Evans

While Evans formally opposes Gallinger's motion on the merits, the result is no different on this record. As an initial matter, the record does not support a reasonable jury finding objective proof that Evans was deprived of the minimum civilized measure of life's necessities.

While Evans attests that the smell of the fumes was strong and resulted in him having trouble breathing, the largely unrefuted evidence of record indicates that the December 11, 2017, shakedown involved a foul odor, which lasted for just a few hours, and that WSPF staff involved in carrying out the shakedown took measures to ensure that any odor or fumes were eliminated as quickly as possible, including turning the exhaust fans to Purge Mode and turning on hallway fans. Although Evans attests that the exhaust fan in his cell was "turned off" that day, even inferring that based on his personal experience he was able to discern that his exhaust fan was not in "Purge Mode," Evans does not dispute that the exhaust fan in other cells and the hallway fans were in working order to dispel some of the sewage fumes. Moreover, Evans does not dispute that the strike team responsible for conducting the shakedown in the Echo Unit did not require any sort of breathing assistance or even masks to shield their intake of the same smell. Furthermore, Evans does not dispute that his entire exposure to the sewer fumes in his cell lasted for approximately 30 minutes on December 11. In viewing the totality of these circumstances, a fact-finder could not reasonably conclude that Evans was subjected to constitutionally deficient conditions of confinement that day.

That said, viewing Evans' statements related to his own difficulty breathing entirely in his favor may arguably permit a reasonable jury to find that he was suffering from a serious medical need, at least while subjected to those fumes.  Although Evans' breathing complaints resulted in his being removed from his cell twice and to his symptoms abating both times, he also attests to having trouble breathing while in his cell on December 11. Thus, on this record, finding objective proof of a medical need requiring medical attention is a close call, particularly since Evans has not adduced evidence related to the severity of his asthma, or even an asthmatic diagnosis, and defendant argues that it would be unreasonable to infer that Evans was having difficulty breathing because there was no *record* of him reporting having trouble breathing, nor did he ultimately receive medical attention for breathing issues until December 27th.

Still, to accept Gallinger's position that Evans did not actually have trouble breathing on December 11, 2017, would arguably credit defendant's evidence over Evans' own declarations, which would be inappropriate at this stage. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  And an inability to breathe (regardless of any asthma diagnosis) can present a serious and urgent medical need. *See Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) (citing *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005) (acknowledging that asthma may not always constitute a serious medical need, and instead, treating the question of breathing difficulties as fact-intensive); *see also Krout v. Goemmer*, 583 F.3d 557, 568 (8th Cir. 2009) (assuming "difficulty breathing" to be a serious medical need); *Harrison v. Ash*, 539 F.3d 510, 515 (6th Cir.

13

2008) (addressing claim brought by prisoner who died after asthma attack). If a jury were to credit Evans' assertions that he could not breathe when he was in his cell, then it could likewise reasonably infer that he was suffering from a serious medical need, at least while in his cell. Accordingly, Gallinger is not entitled to judgment in his favor on the first, objective prong of Evans' Eighth Amendment claim.

Even so, defendant Gallinger is entitled to judgment in his favor because no evidence of record permits a reasonable jury to find that he was personally aware of, much less consciously disregarded, Evans' breathing problems. On the contrary, the undisputed evidence establishes that another staff member removed Evans from his cell when he first complained about the fumes during the plumbing inspection, although the record does not indicate when Evans was first removed from his cell, returned, or removed again. Regardless, it is clear that he was placed back in his cell for some period of time, started screaming, and at 11:42 a.m., he threatened to kill himself. Just six minutes later, however, psychology staff interviewed him at his cell, which led to his movement out of the Echo Unit altogether for the duration of the shakedown.

The question for purposes of Gallinger's present motion is whether there is sufficient evidence for a reasonable jury to infer that during the uncertain period of time between Evans return to his cell from the day room sometime mid-morning, and approximately 11:42 a.m., defendant *Gallinger* was both personally informed that Evans was having breathing difficulties *and* then failed to take corrective action. On this record, such an inference would simply be unfounded.

14

Certainly, Evans seems to claim that Correctional Officer Gallinger was the person responsible for shutting his cell window when he began screaming. Yet not even Evans is willing to sign a declaration to that fact; instead, he declares only that "staff" responded by closing his window and telling him to stop screaming. In fairness, Evans argues in his response to defendant's proposed findings of fact, that video footage of his hallway would have shown that it was Gallinger talking to him in front of his cell, but he does not explain *how* he knows this, much less aver to this fact. Thus, the court is left to question why, if Evans had personal knowledge that Gallinger was responsible, he did not attest to that fact in his declaration.

Even assuming for the sake of argument that Evans were willing to attest that Gallinger spoke with Evans during the shakedown, however, Evans has come forward with *no* evidence even hinting that Evans specifically told Gallinger that he was having trouble breathing. Rather, all Evans declares is that he was "screaming for help," but Evans does not actually say at that point whether he was merely complaining about continuing sewage fumes or still complaining that he could not breathe. Without *any* indication that Evans was complaining that he was having trouble breathing, Gallinger's -- or any other correctional officer's -- failure to take more immediate action than was taken at 11:42, when he threatened to harm himself, does not permit a finding of conscious disregard of a serious medical need. Instead, the only reasonable inference to be drawn is that "staff" were not responding to his screams, which in no way supports a finding that Evans' urgent medical need was being ignored by defendant Gallinger. Accordingly, defendant is entitled summary judgment being entered in his favor as a matter of law.

ORDER

IT IS ORDERED that:

1) Defendant Shawn Gallinger's motion for summary judgment (dkt. #62) is GRANTED.

2) Plaintiff LaDell Evans' motion for assistance in recruiting counsel (dkt. #60) is DENIED.

3) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 5th day of January, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge